Good morning, Your Honors, and may it please the Court, my name is Kenneth Bordas. I represent Mr. Daniel Smith, a former employee of Ochsner Health System. Your Honors, the issues in this case are simple, really. It's whether or not an employer has the obligation to prove all elements of an affirmative defense beyond peer adventure, as this Court has roundly held consistently, and still does in the District Court today, as far as two months ago and a few District Court decisions that were just handed down. And secondly, where there are disputed facts, as there are many in this case, whether or not those disputed facts are a question for a jury rather than a judge, regardless of the Encino decision regarding a fair reading. That Encino decision, Your Honors, as you well know, changed the narrow interpretation, narrow construction of FLSA statutes, and now makes it a fair reading. But that has no bearing on this case whatsoever, where there are just disputed issues of fact. Moreover, Your Honors, this case has a highly compensated exemption that is being applied with regard to the administrative exemption. In that highly compensated exemption, Ochsner must prove beyond peer adventure, first, that Mr. Smith's primary duty was that of non-manual labor. If they're able to prove that, which they have not, they then have to prove one of two things under the administrative exemption. They have to prove that Mr. Smith customarily and regularly did work directly related to the management and business operations of the employer, or as this Court put it in Dewan in Dalheim, that duties that are administering the business of the enterprise, that enterprise being Ochsner. Mr. Smith didn't work at Benson Tower. He didn't work in the procurement, in the administration aspect of Ochsner, the budgeting, the finance, legal compliance. He was someone who had no subordinates and plenty of supervisors. He was a cog in the wheel. He had to go out, get these organs, bring them back. He disseminated data and provided it to decision-makers and only did things based on what they told him to do. Counsel, when would you say in the district court a specific argument about needing to show that he was involved in non-manual labor was raised? Certainly the arguments made in the district court found that this was not an issue before the court. What's your response to when this was injected and how was it injected into the case? Absolutely, Your Honor. We did notice that in Opponent's brief and in the district court. The district court, in fact, in footnote 58 on page 14 of its opinion, specifically cited to the actual duties, the job duties that Mr. Smith had to do, which we said, and I think in our opposition, plainly stated, defendant provides insufficient and at times directly contradicted evidence that plaintiff's primary duties were the performance of office or non-manual work. We cited to those job duties directly in that opposition. The district court, which is a problem with a lot of the facts, to the summary judgment in the record. That's in the record, our opposition, where it states that is record site 592 to 593. That's one of the many things. Would you say that was the end of the argument, that you pointed out that, or did you then proceed to discuss what's required, manual versus non-manual, whatever? Your Honor, I'd say that, first off, it's their burden to prove beyond . . . I'm looking at the argument. How did you present the counter-argument to what they had to do? If something is not in dispute, then it's basically conceded. What did you do beyond what you just told us? In the disputed facts section of the contested facts that we filed into the record, we specifically cited and said that . . . some to the effect of, and I don't have the quote here with me, that Oshner contends that Mr. Smith's job duties were non-manual in nature. We dispute this for several reasons. We state that these job duties were manual, his primary duty was manual, and we cited in those contested facts to the specific duties listed in the job description. That, Your Honor, is what the district court in its footnotes cited to, was our disputed facts, where we disputed that specific fact in the contested facts. So we had addressed it at that point, but . . . and to that extent, and that extent alone, Your Honor, to answer your question, that is the extent we addressed it, because Oshner did not put forth any evidence to prove that element beyond period of venture, and it was their burden to do so. Why don't you leave that issue and move on? You have other . . . Absolutely, Your Honor. Thank you. But it is an important issue, because if they can't meet that primary duty being non-manual labor, the issue is over, and there are disputed facts to that. So once they're able to do that, as I discussed, that goes directly to whether they customarily or regularly performed work to the business administration of Oshner, to the enterprise of Oshner. And so once we get through the duties, which are all disputed, which we have disputed, for instance, Your Honors, they say that Mr. Smith had something to do with hiring new people. Mr. Smith, in his 17 years, only twice had anything to do with interviewing anyone. That's hardly customary or regularly under the regulations. So the fact that the district court used that as evidence of him performing customary and regularly exempt duties is contradicted by the evidence that he didn't do that, and moreover, he didn't do that in the three years of the applicable statutory period that this case involves. The same thing with ordering supplies. There's contested evidence that Mr. Smith ever ordered supplies. In fact, two of the people deposed, or one of the people deposed, Tim, Terrence Bell, excuse me, Your Honors, who was also a transplant coordinator, said it was Tim Ernst that did the supply ordering and not Mr. Smith. So that's a contested fact that should be weighed by a jury. Yet that, the court used that as evidence of finding that he, that Mr. Smith did duties that were exempt under the administrative exemption. The biggest issue, Your Honors, in this duties analysis is the quality control. Mr. Smith is not a licensed surgeon. He only has a high school degree. He had an LPN degree, which notably the Fair Labor Standards Regulations says is not an exempt profession. Licensed Practical Nurses, by the Code of Federal Regulations, 29 CFR 541.301E, says that LPNs are generally not exempt people. But despite that fact, Mr. Smith was not a licensed LPN at the time. That license had expired years ago. He was just someone with a GED. And all he did was provide data to decision maker surgeons who then told him what to do. The fact that if the surgeon said that Mr. Smith had any authority to make decisions on who was suitable to receive an organ and who was not, they'd be in contravention of a lot of regulations, including the unit's policies, that they're obliged to follow. So Mr. Smith- The defendant needs only to succeed on one exemption. Is that correct? Correct, Your Honor. And what about on procurement? Now, you mentioned earlier in your oral argument that procurement doesn't apply, but there's some testimony, I believe, in the record, or some evidence in the record, about him being involved in the procurement of the donor organs. Are you defining procurement as in supplies and things of that sort to the operation? Or would that specialized operation also consist of a fall in the category of procurement? Absolutely, Your Honor. So, yes, the receiving and transporting of organs is not procurement in the traditional sense, as in running a business. What's your authority for that, to make that distinction or to define the term so as to exclude that? Absolutely, Your Honor. It goes right to the heart of the Doon case in the production dichotomy, in the production administration dichotomy. What case did you say? That's Doon, V-M-I-L-L-C. That case is 2017, and that case specifically said that people like Mr. Smith, who are doing things as a production of services, right, not as administering the business and the enterprise of the actual company, is essentially just doing those services, right? He's going to get those organs for the transplant services. In fact, the district court even said in its opinion, organ procurement coordinator is not determinative. It is accurately descriptive in that Mr. Smith's job involves procurement of organs, a primary duty related to Ochsner's business of operating transplant medical services, not Ochsner Health System. That's just one small department of Ochsner, and that he is essentially doing this work in order to keep selling that product, selling that service. So that is directly on point with Doon in the production administrative dichotomy. That's what the district court in this case says we need to do away with. That case in Doon, the district court saying, it says on the record on appeal 1215, and a footnote 51 again, the district court says, notably, Doon relied on the since-rejected premise that exemptions are construed narrowly against the employer as opposed to fairly read. It goes on to say, a fair reading of the phrase, any one or more of the exempt duties of responsibility, though, cannot mean that the employer must prove one of the administrative exemption elements as they are analyzed for purposes of that exemption. So Judge Engelhardt, what the district court there is saying is he doesn't have to prove one of the elements, and I think that goes too far. I think that you still have to prove beyond pure adventure one of the elements of the exemption that you're trying to claim, because that's an affirmative defense. Otherwise, what we're going to have is we're going to have companies who have people that have a highly compensated exemption essentially saying, everyone's exempt. All you have to do is interview somebody once a year, and we're just going to claim you're exempt. Or we're going to have two people who are making $80,000 a year and fire one, pay one just $101,000, and say, you're now exempt, because you're just not. Isn't that where fair reading comes in? Fair reading of the, that's the concept involved that would prevent that type of extraordinary application? Well, Your Honor, I think the fair reading as it's applied by the district court here invites that kind of abuse to the FLSA, because there's nothing wrong, and the Encino case and the fair reading have nothing to do with the production administration dichotomy, nothing at all. This is a fact-intensive test of the duties that Mr. Smith performed. It's got nothing to do with a fair reading of the statute under the FLSA, which is what Encino was concerned with. In particular in Encino, they were concerned with the conjunctive or within the statute of automobile salesmen versus service providers. That's a statutory reading. Here we're dealing with federal regulations, but my point, Your Honors, is that if we're dealing with a statute or a regulation, it doesn't matter. We're dealing with disputed facts, and we're dealing with the production administrative dichotomy, which was completely well decided in Duin in a very detailed opinion. That opinion in Duin, despite Encino and the fair reading, was cited by this court in Amaya, the NOIPI. I don't know how to say it, NOIPI, I guess. It was also used . . . in that case, this court reversed the summary judgment as well, finding disputed facts, but also citing to Encino and Duin. Counsel, I always have a hard time understanding Duin, but let me make sure what you're saying about it. Is it specifically addressing procurement, or is it, which I don't see that it is, or is it this concept you have used several times, production versus administrative functions? Is that what you're drawing from Duin? Absolutely, Your Honor. But it's not a procurement case, is it? Duin, no, Your Honor. Duin involved . . . Right. Duin involved. I mean . . . Of course. I'm going to cut you off, but you were giving me an answer, but that's not where I want you to head. So it seems to me that whether going around and doing the very essential role of collecting the organs and making whatever other arrangements are necessary preparatory to that, whether that's procurement or not, it would certainly be helpful if we had a more on-point decision. It is the essential part of the job that he has to procure those, but there are a lot of other words you could use, and whether procurement in a sense meant by the Fair Labor Standards Act and the regulations is an entirely different question, but that is what you're calling your best case, which may be very helpful, but I just want to make sure that I understand that that's your best way for us to understand what we ought to be looking for in deciding whether this is procurement. No, Your Honor, it is a very instructive and a very applicable case, but there are other cases that deal with people who are investigators, who are not exempt under highly compensation exemptions or administrative exemptions. And I guess, same thing, I'm concerned with what procurement means. You don't have a case that offers some definition of procurement. No, Your Honors, and what's important and what the district court in a lot of cases recognizes is it's not the title of the person's job, it's actually a description of what they do. Just because he's going out and getting organs, a transplant coordinator, right? So he's interchangeably called a procurement coordinator, a transplant coordinator, and Dr. Loss, the witness for Ochsner, calls him a recovery coordinator. So the fact that he's going out and doing this job, couriering organs, so to speak, isn't necessarily determinative of him being a procurement person for the business of Ochsner as a whole. He's just helping that one service of Ochsner. To put it, I guess, the best way, I'll use the deposition testimony of their corporate deposition. And I guess what I'm saying is this, if you could say this is what procurement is and this is what he does, therefore it is not procurement, that would be helpful, but you don't have anything like that. I do not have anything like that, Your Honor, with the exception of generally procurement in companies has to do with maintaining supplies, going out and making sure that you're stocked full of whatever, napkins, straws, et cetera, et cetera. This is a process by which someone like Mr. Smith gets information from someone else, gives it to a decision maker, and through that service of them making money in their business then goes on and says, okay, go get that thing. That's, I guess, akin to like a mechanic saying, I've got to go get a part for a car, so I'm going to go procure some brake pads, I'm going to go procure something else. That has nothing- Like go get a heart for this desperately ill patient. Exactly. That's our problem, is trying to figure out how that works. Your time is up. Thank you, Your Honor. You'll have some rebuttals. I didn't realize, sorry. Do you have anything for us right off the bat on procurement? Well, Your Honor, first may it please the Court, my name is Jennifer Kogas and I represent the appellee, Ochsner Health System. I did want to start, I was going to start with your question, but we can move on to Judge Engelhardt's procurement question regarding the dichotomy of production versus administrative. Procurement, like my opponent just explained, is obtaining the goods needed to perform the income generating service of the entity. Where does that definition come from? I don't have a site off the top of my head just from reading the accumulation of the opinions, but in Duan, your opinion, Judge Southwick, if you look at the dichotomy- That's why I can never understand it very well, but go ahead. Well, if you look at your opinion where you explain the dichotomy of the process of being administrative versus performing the income generated service, in that case, and in denying summary judgment and affirming that denial, the individuals at issue were mud engineers and they were physically looking at the drilling mud and adding additives to make sure that that product came out okay. In that opinion, you affirmed reverse summary judgment and found that they were part of the production of the income generating service, the actual fluid, the oil. Here, what Appellant Smith did is procure, obtain the needed part, so to speak, being insensitive, for the income generating service of the business, which was the transplant surgery. Would it be possible to just use a black's law dictionary for the word procure, because it seems like we're spending a lot of time talking about what it means in the context of this statute, and we haven't really gotten a citation where this court or the Supreme Court has ever, or even any kind of other guidance that defines it otherwise. Is that a fair way to- That would be a fair way, and I can supplement that to this court, but procurement is only one tiny piece in what Appellant Smith did that added to his being exempt under the highly compensated- Well, and I understand you have several fronts that you're arguing that qualify as an exemption, so I'm not suggesting that procurement is only, it just seems like we've gotten into that word here in the last few minutes. But in looking at the black letter definition of the word and the general sense of the word, to take a step back and look at what Appellant did. Okay. A couple of things before we leave that. I will say that one of your better arguments is procurement, and that's why I'm focused on it, at least. And secondly, even though I doubt if there's case law or other authority dealing with what this specific kind of procurement, what would be helpful is something outside of standard supplies for a company, where procurement has been applied to that, so not pencils and paper and other kinds of supplies, but just where procurement has been used in a somewhat unusual situation such as this. But anyway, why don't you proceed? I did want to address your question, Judge Southwick, regarding the non-manual labor issue. I do agree that it wasn't raised and it wasn't briefed below in that there's a potential that my opponent has waived that argument. But regardless, I'd like to point out the record evidence on that issue. First part of the highly compensated exemption test is that the employee's primary duty included the performance of office or non-manual work. There's a distinction where it says includes, not primary duty is. But here, there is an absence of anything in the record to suggest that this job had any manual aspect to it. My opponent did not point any aspect of the job out in the record below. He did so in the appellant's brief. In his brief, he erroneously cited to the testimony of another organ procurement coordinator named Terrence Bell, record page 724 to 735. He uses that testimony to say that collecting and transporting organs was the job's, quote, primary purpose. Terrence Bell said no such thing. He said that when doing, quote, the fly-out job, transporting and getting the organ and returning it was the primary thing he was doing at that point. He did not testify that was the primary duty of the job. Secondly, he made no mention of any manual aspect of the job in transporting the organ. The only record evidence regarding the manual aspect of the job comes from testimony of Kyle LaBoeuf, another organ procurement coordinator. On record page 706, he said, I want you to know we have been supplied with carts that have wheels on it. It's basically up to us if we want to carry it or not. I don't think there's anything manual about this job. That's the only record evidence on manual versus office work in this case. I also want to address the . . . Let me make sure I understand. The manual aspect of this job, without thinking of it in terms of the Fair Labor Standards Act, is whatever you want to call the driving of the vehicle and then the carrying of the organ in some sort of container and bringing it back. That's the manual aspect of this job. I believe that is what Appellant is referring to. He has not said that in any brief, but yes, I would think that would be the only . . . Manual work, whether it means what is necessary here, but I just want to make sure what we're talking about. Correct. All of the other duties listed in both the job description and in the record evidence cited to the court are office type work, taking calls, doing computer work, coordinating with the organ procurement agency to obtain the organ, arguing with the agency over regulations of why Oshner should get the organ over another center, correcting mistakes in the record, presenting the information in the record to the surgeon, and presenting, quote, what was important. Here in the record, Appellant Smith, in his own testimony, which is undisputed, talks about what he did in training new organ procurement coordinators, and he said, we would both be looking at the computers, and I would say, what do you see here that you think is important, and how are you going to present that to the surgeon? Appellant Smith would have you believe all he did was he was reading down a checklist and saying blood pressure X, weight X. That is not what the testimony shows. The testimony shows that he was an integral part of a team who received information about an organ, decided whether or not they would accept that organ, and once the decision was made, he had to handle all of the logistics to go there. Do they fly? Do they take a car? Record evidence says he didn't need any approval for that. He had to, quote, make it happen. So in that job, he would make all of the arrangements. Then if he was on, quote, fly out duty, he would travel with the team to go collect the organ from whatever medical center it was. He would bring it back. He would stay in constant contact with the surgeon reporting on the status of the organ and how the procedure was going. He was so much more than a conduit of information, as stated in the brief. So when looking at the standard of both evaluating the exemptions and the highly compensated exemption, you have kind of two competing themes here. One is the Supreme Court in Navarro saying let's look at these exemptions with a fair reading, not the narrow interpretation that we have been doing over the years. And secondly, with the highly compensated exemption, you're dealing with even more of a relaxed standard. The court cited to that, in its opinion, in citing the DOL regulation 29 CFR 601C, the district court noted that the high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties. What the DOL is telling us in that regulation, and then followed up by their opinion letter, where they cite that language and cite the district court's opinion in this case, is because this guy is making $122,000 a year, a lot of the water of the exemption is passed by that high level of compensation. So then when we're looking at the duties, you do not have to do the aggressive analysis as you would as if he had to meet the standalone administrative exemption. And that's what Your Honor, Judge Southwick had to do in Dewin, because he was only fitting in the administrative exemption, not the highly compensated exemption. So here, Judge Ash properly stated that Appellant Smith only had to meet one duty or responsibility that would be exempt under the administrative exemption, only one. But the court went through, and we have record evidence of several. One we've talked about before is procurement. He was the guy who had to get the most important part for the hospital procedure, the organ, to the hospital. He wasn't part of the production of the procedure. He wasn't doing the transplant. He's not the medical team. He's the guy who had to get the supply there, procurement. Next is quality control. He was in charge of making sure that the regulations were being followed, that Osher was properly being granted the organs when it was their turn, arguing and disputing whether it was our turn and could we please trump somebody because we have a really sick person here. He testified that he negotiated those things. In addition, the record, even though the district court found that there was a dispute over whether his primary duty was exercising discretion and judgment, there is plenty of evidence of his exercising his own discretion in, first of all, very importantly, in turning down an organ without even calling a surgeon. He testified to doing that in Record 515. He said it was something that evolved. It wasn't part of a policy or procedure. He knew he could deny the organ by being there for so many years and hearing what they had turned down and knowing that they would never use a kidney like that. He had developed discretion. He had been there. He had worked with these surgeons. He knew what they wanted. He wasn't just rotely reporting information and getting their determination. He was part of the decision. Dr. Loss, the main surgeon on the transplant team, described in the record what a complex job it was that the OPCs performed for Osher at Record 563 to 564. He said that they would take vast amount of information and bring it down into a concise story. They weren't calling these surgeons at 3 in the morning and reading the entire record to them. They were giving them what they felt important, what they felt the surgeon would want to hear, and any follow-up information needed. And I think most applicable is Atone Smith's own description of his job in the deposition when I asked him what did he still find challenging about the job even though he had done it for so long. And he said, I felt like it was an incredible amount of responsibility to make sure that I got the information correct. I knew I was in the position of making something bad happen if I wasn't able to stay awake and think clearly enough to actually get the information out there and get it right. So that was a challenge and that was hard. This is not someone without part of discretion in this story. He meets both elements of the administrative exemption when he only has to meet one duty of the entire exemption. He is important to the business of the job. He's not a production employee. And secondly, he's exercising discretion and judgment as part of the team accepting or rejecting the organs. Pelley asks that this court affirm the summary judgment from Judge Ash. Thank you. Thank you, Counsel. Hello, Your Honors. Last five minutes. I think it's important that I put a little perspective on just how many hours Mr. Smith worked. When he complained about not being paid overtime back in 2012, he was working 102 hours a week. In addition to that, he was 60 hours on call. He was off five hours a week. When he complained, he was not getting any overtime. He was being paid hourly. In response, what Ochsner did was they said, okay, we're going to change you to a salaried employee and now call you exempt. Never having given him the overtime that he was owed and then moving him into an exempt role. His duties never changed. And what he did as a production line assembly guy, getting the thing, giving it to them, making money for the transplant service of Ochsner, never changed. Counsel, let me understand the relevance of that other than maybe some basic point of fairness. All that predates your current claim, correct? Those dates? Absolutely, Your Honor. And so when he got into the highly compensated area, which basically roughly means over $100,000 on the current regulations, it's a new ballgame. So tell me why what you just said should be a factor. Because it shows that Ochsner knew that the duties he was performing were not exempt, in my opinion. And then also that when they changed him to a salaried employee, they said, okay, we're just going to apply this. We're not changing any of his duties. His duties remain the same. But paying him more. No, he was being paid more as an hourly employee. They actually reduced his salary to call him salaried and exempt at that time. So he was already making over $100,000 without the overtime for the 60 or so roughly hours that he worked overtime in that week. What's also important, Your Honor, is the testimony of their corporate opponent who said in her testimony that Mr. Smith is, quote . . . Let me understand something, because you brought up this hourly wage thing. So his complaint about the hourly wage was the amount of pay or the amount of hours? Both. It was the amount that we were working so many hours, and we're not getting overtime for those hours. All right. So, but then he agrees to become a salaried employee where he calculates that the pay is going to be less than what he made as an hourly employee? This wasn't his agreement. This was told this is what your job is now going to be classified as. And he either worked or didn't, and he chose to work. All right. So he was unilaterally reclassified as a salaried employee? Correct, Your Honor. That, yeah. In response to around the time when he was complaining, this is what the response was. But what I was going to say just before that, Your Honors, is that their corporate opponent said in her testimony that Mr. Smith is not an administrative employee. He's a clinical employee. He's a clinical support employee. So their own corporate opponent says that Mr. Smith is clinical support staff, going back to the production-administrative dichotomy. And Your Honors, to the procurement issue, and especially to the Duin case and the application to courts right now, there are several cases within the last couple of months that have applied Duin and applied this production-administrative dichotomy, finding that summary judgment was improper. And one was a bench trial where a very detailed opinion was written by . . . I have it right here, Your Honors. The court in Hobbs v. Evo, it's a Southern District of Texas case, where the court said that the main duties of these people were to transport cameras around, to put them into little oil well holes, and then to get that data and bring it back to their employer as the product and provide that data to the employer who then made decisions. The court had a bench trial and wrote a very lengthy opinion on how those duties do not qualify as administratively exempt. Moreover, they're not entitled to a highly compensated exemption in that case. There are other cases that involve inspectors and examiners, including in the Code of Federal Regulations 541.203, where it discusses samples of administratively exempt employees, specifically excluding inspectors, data gatherers, people like Mr. Smith, who, as President Counsel just said, would be gathering data at three or four in the morning in order to provide to the surgeons. And, Your Honors, the last thing I'll say before taking any questions and finishing is that there's ample testimony that somebody like Mr. Smith could not pick and choose what he gave to his surgeons. That's put in the briefs, in the reply brief, page 16 through 19. There's ample evidence that Mr. Smith did not have that opportunity. We ask this Court to reverse the District Court's finding that there are disputed issues of fact. Thank you, Your Honors. Thank you both. An interesting case, an important one, obviously, for your parties. That ends our arguments for the day, unless I've overlooked anything.